UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| vs. ) | CAUSE NUMBER 3:08-CR-49(01)RM |
| ) | |
| KEVIN RISNER ) | |

OPINION AND ORDER

On January 31, 2008, the Starke County Sheriff's Department received a 911 call in which the caller hung up. Department policy required that all such calls be checked, so Deputy Bill Dulin was dispatched to the call's origin, which was Kevin Risner's residence. Deputy Dulin found Deborah Dean in the front yard, clad in a trench coat. Ms. Dean said it was she that called 911. She said she lived there, and was Mr. Risner's girlfriend. Ms. Dean said Mr. Risner had been drinking all day, had assaulted and choked her, and had threatened to kill her. Deputy Dulin saw signs of injury to Ms. Dean's eye and red marks on her neck that were consistent with (but not definitive proof of) choking. Ms. Dean told Deputy Dulin that Mr. Risner had several weapons in the house, including a pistol, and had said he had nothing to lose because he already was going to prison. Ms. Dean said Mr. Risner usually hides in the basement crawl space when the police come.

After knocking at the back door and receiving no answer, Deputy Dulin summoned backup assistance. Deputy Dulin knew Mr. Risner from arresting him in the past. He knew Mr. Risner to be a convicted felon (felony drunk driving) who was prohibited from possessing guns. He also knew there had been other domestic

violence calls to the house. When the other four officers arrived, Deputy Dulin and the officers entered through the unlocked back door. The officers had no warrant. They made certain no one was in the kitchen, then entered the family room and noted a glass-front gun cabinet in the dining room with the door ajar. The carpet showed marks consistent with a person having been dragged along the floor. The officers found the intoxicated Kevin Risner in the basement crawl space and took him out of the house. One officer transported Mr. Dulin to jail; Deputy Dulin and the other officers remained.

Deputy Dulin asked Ms. Dean if they might go inside to take her statement, and she went into the house with Deputy Dulin for that purpose. The other officers followed. Deputy Dulin and Ms. Dean sat at the dining room table, next to the gun cabinet, as they waited for Detective Kelly Fisher to arrive to take a taped statement and process the scene. Ms. Dean asked the officers to take the guns out of the house. The officers confiscated three shotguns, one long rifle with a device alleged to be a home-made silencer, a .22 double barrel pistol, and a Red Ryder BB-gun.

Ms. Dean testified to a set of facts much different from the facts just found. She testified that she didn't tell police that Mr. Risner had threatened or assaulted her, that Mr. Risner had not assaulted her, that she never told the police Mr. Risner hides in the crawl space, that the police gained entry to the residence by kicking in the back door, and that she told the police that she had a place to stay other than that residence. The court found Ms. Dean to be a considerably less

2

credible witness than Deputy Dulin, telling a considerably less credible story. This might be because she, too, had been drinking on January 31, or it might be for some other reason. In any event, she was unable to provide a coherent explanation for having called 911 (she said she called because Mr. Risner pushed her through the door and locked her out, yet she called from inside the house).

Deputy Dulin and Ms. Dean, though, both agree that Ms. Dean never affirmatively consented to either of the officers' entries into the residence she shared with Mr. Risner. A search conducted without a warrant is presumed to be unreasonable, Katz v. United States, 389 U.S. 347, 357 (1967), so Mr. Risner moves to suppress the guns the police took from his residence. The government contends that the first entry into the residence was permissible because exigent circumstances existed, and that Ms. Dean gave implicit consent to both entries.

Warrantless entries and searches of a home are presumptively unreasonable. Payton v. New York, 445 U.S. 573, 586 (1980). When the government claims exigent circumstances existed to support a warrantless entry into a residence, the government bears the burden of demonstrating "that a reasonable officer had a 'reasonable belief that there was a compelling need to act and no time to obtain a warrant.'" United States v. Andrews, 442 F.3d 996, 1000 (7th Cir. 2006) (quoting United States v. Saadeh, 61 F.3d 510, 516 (7th Cir. 1995)). A warrantless entry may be justified by hot pursuit of a fleeing felon, the imminent destruction of evidence, the need to prevent a suspect's escape, and to address the risk of danger to police and others inside or outside the dwelling. See

Georgia v. Randolph, 547 U.S. 103, 116, n. 6 (2006) (citing several cases); see also Norris v. Bain, 2006 WL 753131, *8 (S.D. Ind. 2006) (unreported) (citing Minnesota v. Olson, 495 U.S. 91, 100 (1990)); United States v. Lottie, 2007 WL 4722439, *4 (N.D. Ind. 2007) ("Hot pursuit of a fleeing felon, public safety, or concern over destruction of evidence may each give rise to exigent circumstances.") (citations omitted). Officers may enter under the exigent circumstances exception to protect or preserve life or avoid serious injury. See Brigham City, Utah v. Stuart, 547 U.S. 398, 403 (2006) (citing Mincey v. Arizona, 437 U.S. 385, 392 (1978)); see also United States v. Bell, 500 F.3d 609, 612 (7th Cir. 2007). The court must "analyze the situation from the perspective of the officers at the scene and must ask whether the officers had an objectively reasonable belief that exigent circumstances existed." Leaf v. Shelnutt, 400 F.3d 1070, 1081 (7th Cir. 2005) (internal quotations and citation omitted).

No exigent circumstances justified the officers' entry into the residence. The government notes that Mr. Risner was known to have a firearm and could have begun firing at those outside the residence; Mr. Risner was known to drive while intoxicated in the past, was known to be intoxicated, and so might have taken to the road. It's true that nothing absolutely prevented these possibilities, but they were no more than hypothetical possibilities, not an apparent urgency that justified making what would have been an unreasonable search for Mr. Risner under other circumstances. There was no risk of destruction of evidence; there was no need (as distinguished from an outside chance) to protect life or prevent

4

serious injury. Compare United States v. Dukes, 2008 WL 56017 (N.D. Ind. 2008). Ms. Dean didn't tell Deputy Dulin that she needed to get back into the house because she had no place else to go. Compare United States v. Henderson, 536 F.3d 776, 785 (7th Cir. 2008).

Implied consent is another matter. No warrant is required if consent is obtained from an occupant. See United States v. Dorsey, 27 F.3d 285, 290 (7th Cir. 1994). Voluntary consent "lifts" the warrant requirement. United States v. Stribling, 94 F.3d 321, 324 (7th Cir. 1996). One can manifest consent through actions as well as words. United States v. Walls, 225 F.3d 858, 863 (7th Cir. 2000) (stating that by opening a door and stepping back to allow police entry, a defendant can consent to the police entry into her home). Consent can be express or implied from the circumstances. See, e.g., United States v. Wesela, 223 F.3d 656, 661 (7th Cir. 2000) (finding implied consent where defendant's wife called police, consented to their entry, didn't object to search as it occurred, and provided information to officers during search); see also United States v. Renken, 474 F.3d 984, 987 (7th Cir. 2007) (the argument that co-tenant didn't expressly invite officers into home "neglects to appreciate that consent in certain cases can be implied in the absence of clear verbal permission.").

United States v. Walesa involved several of the components of Mr. Risner's situation. Mrs. Wesela called 911 and reported that her husband had a gun, had been threatening to kill her, and had shot and killed a family cat. United States v. Wesela, 223 F.3d at 659. She asked the police to come to her house. Id. When

5

the police arrived, Mrs. Wesela admitted them to the apartment. The police asked where the man with the gun was and she said he was in the bedroom; she added that the gun was next to the bed. Id. After arresting the defendant, the officers searched the room for the gun and found it. While Mrs. Wesela spoke with a detective about the incident, another detective went about the apartment collecting and assessing the evidence, including the dead cat, a trail of blood, bullet holes, and ammunition. Id. The detective didn't ask Mrs. Wesela for permission, and she didn't object. Id. at 660.

Mr. Wesela argued that his wife allowed the officers to enter the home for the limited purpose of arresting him, not to search for the gun. United States v. Wesela, 223 F.3d at 660. He also argued that the search conducted while Mrs. Wesela was talking to the detective wasn't done with her consent, express or implied. Id. The Wesela court explained that "[u]nder the Fourth Amendment, the standard for measuring the scope of an individual's consent is 'objective reasonableness': 'what would the typical reasonable person have understood by the exchange between the officer and the [person giving consent]?'" United States v. Wesela, 223 F.3d at 661 (citing Florida v. Jimeno, 500 U.S. 248, 251 (1991)). The court found that Mrs. Wesela gave consent to search the apartment for both her husband and the gun because she called the agents for the express purpose of ridding her house of the threat posed by her armed husband and allowed the officers to enter the house. Id. at 661. "The fact that there was no direct verbal exchange between [the detective] and Mrs. Wesela in which she explicitly said 'it's

6

o.k. with me for you to search the apartment,' is immaterial, as the events indicate her implicit consent." Id. Although Mrs. Wesela was in another room when the detective conducted the search, "[d]ue to the proximity of the rooms, [she] was probably aware of what was going on in the bedroom and elsewhere in the apartment." Id. The court stated that "[h]ad she wished to do so, she could have objected to [the detective's] search." Id. (citing United States v. Stribling, 94 F.3d 321, 324 (7th Cir. 1996) and Gerald M. v. Conneely, 858 F.2d 378, 384-85 (7th Cir. 1988)).

In United States v. Hylton, 349 F.3d 781, 783 (4th Cir. 2003), Hawanya Harper called the police telling them that her boyfriend was in her apartment with a gun and wouldn't let her in. When the police arrived, Ms. Harper told them that two of her children were either in the apartment or at a neighbor's house. Id. at 783. The defendant surrendered outside the apartment after several phone calls from the officers, who then entered the apartment and conducted a protective sweep to "secure it" and to retrieve the gun. Id. at 784. The district court denied Mr. Hylton's motion to suppress, but not on the basis of consent. Id.

The court of appeals disagreed with the district court's conclusion that the record didn't show implied consent. United States v. Hylton, 349 F.3d at 786. The court reasoned that "[c]onsent may be inferred from actions as well as words." Id. "In this case, the circumstances and Harper's words lead to the inference that she gave consent to the police to search her apartment and thereby to enable her to return to the apartment in safety. And to this end it can be inferred that she

7

authorized officers to retrieve the gun that had put her at risk." Id. The police could infer from Ms. Harper's words and conduct that she gave the police authority to enter the apartment and retrieve the gun that caused her fear and apprehension. Id. The court reasoned:

> When a tenant is barred from entering her apartment and calls the police for assistance, it can be inferred that she is authorizing them to enter the apartment; when a tenant expresses fear about a dangerous condition in her apartment and calls the police for assistance, it can be inferred that she is authorizing them to diffuse the dangerous condition; and when a tenant calls police for assistance, stating that she is barred from her apartment, expressing fear about the presence of a gun, and describing precisely where the gun is located, it can be inferred that she is authorizing the police to enter the apartment and retrieve the gun.

Id. at 786-787.

Walesa is binding authority and Hylton is persuasive authority. Still, today's case is a closer one that Walesa or Hylton, because Ms. Dean hung up during her 911 call. She eventually made her statements to police not to summon the police, but in response to Deputy Dulin's arrival. With other facts, that distinction might preclude a finding of consent. But even after Deputy Dulin arrived, Ms. Dean could have said everything was fine by that point. Instead, she detailed what Mr. Risner had done to her, what he had threatened to do, what firearms he had, and where police officers could find him in the house. Mere acquiescence or failure to object to a police entry is not consent, United States v. Cole, 195 F.R.D. 627, 633 (N.D. Ind. 2000), but Ms. Dean went well beyond acquiescence or not objecting. No typical reasonable person would interpret her statements — which her physical

appearance corroborated — as anything other than a request that police deal with the situation by removing her drunk and armed co-resident. Ms. Dean impliedly consented to — indeed, she impliedly requested — the officers' entry to remove Mr. Risner.

Ms. Dean also consented to the re-entry, albeit not in words. Deputy Dulin asked her if they might go inside to take her statement, and she went into the residence with him. Again, such behavior might constitute mere acquiescence to authority under other facts, but not under the circumstances present here. Ms. Dean already had implicitly sent the officers into her home to remove Mr. Risner. The alternatives to going back into the house were to give her statement outside, in the waning sunlight of a late January day in northern Indiana, or to give her statement in the police car. As it turned out, Ms. Dean also wanted the police to take the guns out of her home, which could best be achieved by allowing them back into the house. By accompanying the officers back into her house under these circumstances, Ms. Dean consented to their re-entry.

It would have been better had Deputy Dulin obtained Ms. Dean's express verbal consent to each entry, but the choice of a less preferred path doesn't counter Ms. Dean's consent to both entries. An occupant's consent to search makes a warrantless search reasonable. Georgia v. Randolph, 547 U.S. 103, 106 (2006). There is no basis to suppress the evidence taken from the Risner/Dean residence, so the court DENIES the defendant's motion to suppress (doc. #17).

SO ORDERED.

ENTERED:  December 17, 2008

    /s/ Robert L. Miller, Jr.
Chief Judge
United States District Court